*handwritten: PTC 2-15-01*

# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

### LAFAYETTE-OPELOUSAS DIVISION

U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
**FILED**

**JAN 16 2001**

ROBERT H. SHEMWELL, CLERK
BY_____

| | |
|---|---|
| WILTON HARMON, JR. | CIVIL ACTION |
| VERSUS | NUMBER: 00-0490 |
| NABORS DRILLING USA, INC. | JUDGE DOHERTY |
| | MAG. JUDGE METHVIN |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## PLAINTIFF'S MOTION TO EXCLUDE EXPERT
## TESTIMONY UNDER DAUBERT AND ITS PROGENY

COMES NOW, through undersigned counsel, Plaintiff, Wilton Harmon, Jr., who respectfully moves this Honorable Court to enter an order, excluding from evidence at the trial on the merits certain opinion testimony Defendant, Pool Company, proposes to obtain from its retained expert, Mr. Jeffrey E. Carlisle, L.R.C., on the ground that said testimony is not reliable as required by Fed. Rules Evid., Rule 702, and thus not admissible, all as more particularly shown in Plaintiff's accompanying Memorandum in Support.

CURTIS & LAMBERT
(A Professional Law Corporation)
201 Rue Iberville, Suite 300
Post Office Box 80247
Lafayette, Louisiana 70598-0247
Telephone: (337) 235-1825

By: _____
LAWRENCE N. CURTIS (4678)

## CERTIFICATE

I HEREBY CERTIFY that the foregoing has this day been served upon all counsel of record by placing a copy of same in the United States mail, postage prepaid and properly addressed.

Lafayette, Louisiana this 16th day of January, 2001.

_____
LAWRENCE N. CURTIS

**FILED**

USDC, WESTERN DISTRICT OF LA
ROBERT H. SHEMWELL, CLERK
DATE _1 / 16 / 01_
BY _____

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE-OPELOUSAS DIVISION

| | |
|---|---|
| WILTON HARMON, JR. | CIVIL ACTION |
| VERSUS | NUMBER: 00-0490 |
| NABORS DRILLING USA, INC. | JUDGE DOHERTY |
| | MAG. JUDGE METHVIN |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION TO EXCLUDE EXPERT TESTIMONY UNDER DAUBERT AND ITS PROGENY

MAY IT PLEASE THE COURT:

### (I). STATEMENT OF THE CASE

Plaintiff, Wilton Harmon, Jr., respectfully submits this Memorandum in Support of his Motion to Exclude Expert Testimony under Daubert and its Progeny filed simultaneously herewith. By means of his Motion to Exclude Expert Testimony, Etc., Mr. Harmon seeks an order from this Court, excluding from evidence at the trial on the merits certain opinion testimony Defendant, Pool Company, proposes to obtain from its retained expert, Mr. Jeffrey E. Carlisle, L.R.C. As the ground for his Motion to Exclude Expert Testimony, Etc., Mr. Harmon alleges that the proposed expert testimony is not reliable and thus not admissible under Fed. Rules Evid., Rule 702.

On March 10, 2000, Mr. Harmon filed a Seaman's Complaint for Damages, instituting this civil action against Pool under the Jones

Act (46 U.S.C. § 688(a)) and the General Maritime Law of the United States. In his Seaman's Complaint for Damages, Mr. Harmon alleged that Pool was liable to him for personal injuries he sustained on February 18, 1999, while employed aboard its vessel, the *RANGER VII*.

To defend against Mr. Harmon's claims, Pool retained Mr. Carlisle to function as its expert in the field of vocational rehabilitation. In accordance with this Court's Scheduling Order, Pool furnished Mr. Harmon with a copy of Mr. Carlisle's report dated December 18, 2000. This report indicates that Mr. Carlisle intends to give opinion testimony at the trial on the merits regarding "... Mr. Harmon's employability, rehabilitation potential, and wage-earning capacity,..."[1]

Putting aside any questions regarding Mr. Carlisle's qualifications, a review of his report demonstrates that some of his proposed testimony is not reliable. This is so because some of Mr. Carlisle's opinions are formulated without the same level of intellectual rigor that characterizes the practice of an expert in the relevant field, and are connected to existing data only by the *ipse dixit* of the expert. This is especially true of those opinions rendered by Mr. Carlisle that require the expertise of a physician.

In particular, Mr. Harmon challenges the opinions rendered by Mr. Carlisle on pages 13 through 15 of his report, two-wit:

- "[I]t can be noted by literature on the subject that

---

[1] See Mr. Carlisle's report annexed hereto as Exhibit "A".

persons with a fusion in the lumbar spine area are able to return to sedentary work in a minimum of six weeks after surgery and to very heavy work in a maximum of 52 weeks after surgery." (Page 13)

- "Since this chart indicates that return to even very heavy work is possible within one year after surgery, this indicates that Mr. Harmon could possibly return to his previous employment at the end of his recuperation from this surgery." (Page 14)

- "Barring any future complication, according to the literature, he might be able to approach heavy to very heavy work activities, depending upon extent of recovery, with essentially no wage loss." (Page 15)

Mr. Harmon takes the position that it is inherently unreliable (and indeed mere unsupported speculation) for an expert such as Mr. Carlisle to attempt to extrapolate from "the literature" what the particular effects of particular injuries on a particular person will be. Further, Mr. Harmon contends that such a determination is exclusively within the province of physicians; particularly, those physicians who are treating him for his injuries.

### (II). LAW AND ARGUMENT

Fed. Rules Evid., Rule 702, provides:

> "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

The Supreme Court, in *Kumho Tire Company, Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), examined Fed. Rules Evid., Rule 702, in light of its earlier decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and held:

> "*We conclude that Daubert's general holding -- setting forth the trial judge's general "gatekeeping" obligation -- applies not only to testimony based on "scientific" knowledge, but also to testimony based on "technical" and "other specialized" knowledge.*" (Emphasis added.) *Id.* at 526 U.S., 141, 119 S.Ct., 1171.

See also *Torries v. Hebert*, 111 F.Supp.2d 806 (W.D. La. 2000); and, *United States v. Duhon*, 104 F.Supp.2d 663 (W.D. La. 2000).

In describing this "gatekeeping" function, *Kumho Tire Company, Ltd.*, supra, held:

> "To say this is not to deny the importance of *Daubert's* gatekeeping requirement. *The objective of that requirement is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field*. Nor do we deny that, as stated in *Daubert,* the particular questions that it mentioned will often be appropriate for use in determining the reliability of challenged expert testimony. Rather, we conclude that the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable. *That is to say, a trial court should consider the specific factors identified in Daubert where they are reasonable measures of the reliability of expert testimony*." (Emphasis added.) <u>Id</u>. at 119 S.Ct., 1176.

See also *Seatrax, Inc. v. Sonbeck International, Inc.*, 200

F.3d 358 (5th Cir. 2000); *Tanner v. Westbrook*, 174 F.3d 542 (5th Cir. 1999); and, *Black v. Food Lion, Inc.*, 171 F.3d 308 (5th Cir. 1999).

*Kumho Tire Company, Ltd.*, supra, also reiterated the rule announced in *General Electric Co. v. Joiner*, 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997), that: "... nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." *Id*. at 526 U.S., 157, 119 S.Ct., 1179. Of course, whenever the proposed testimony of an expert is challenged, the burden falls upon the proponent of such testimony to prove by a preponderance of the evidence that the testimony is reliable. See *Curtis v. M&S Petroleum, Inc.*, 174 f.3d 661 (5th Cir. 1999); *Moore v. Ashland Chemical, Inc.*, en banc 151 F.3d 269 (5th Cir. 1998); and, *United States v. Robinson*, 94 F.Supp.2d 751 (W.D. La. 2000)

In his report, Mr. Carlisle concedes that a definite prognosis regarding Mr. Harmon's recovery, in general, and information regarding the effects (restrictions) his injuries will have upon him, in particular, will have to be obtained from John E. Cobb, M.D., before it can be determined whether he can return to his previous employment, etc. However, without this information and solely by reference to "the literature," Mr. Carlisle proceeds to formulate the opinions in question. Parenthetically, Mr. Carlisle's conduct in rendering these opinions under these circumstances demonstrates that he has not exercised " . . . the same level of

intellectual rigor that characterizes the practice of an expert in the relevant field." Rather, Mr. Carlisle's opinions are " . . . connected to existing data only by the ipse dixit of the expert." As such, Mr. Carlisle's opinions are not reliable and thus not admissible.

### (III). CONCLUSION

Pool now bears the burden of proving by a preponderance of the evidence that Mr. Carlisle's proposed testimony is reliable. Pool will not be able to carry this burden given the deficiencies evidenced by Mr. Carlisle's report as described herein. Consequently, Mr. Carlisle's proposed testimony is not reliable as required by Fed. Rules Evid., Rule 702, and the jurisprudence interpreting said Article; thus, said testimony is not admissible at the trial on the merits.

FOR THE FOREGOING REASONS, this Court should grant the Motion to Exclude Expert Testimony under Daubert and its Progeny filed by Plaintiff, Wilton Harmon, Jr., and it should enter an order, excluding from evidence at the trial on the merits the proposed testimony described herein.

CURTIS & LAMBERT
(A Professional Law Corporation)
201 Rue Iberville, Suite 300
Post Office Box 80247
Lafayette, Louisiana 70598-0247
Telephone: (337) 235-1825

By: _____
LAWRENCE N. CURTIS (4678)

<u>CERTIFICATE</u>

I HEREBY CERTIFY that the foregoing has this day been served upon all counsel of record by placing a copy of same in the United States mail, postage prepaid and properly addressed.

Lafayette, Louisiana this 16th day of January, 2001.

_____
LAWRENCE N. CURTIS

JENNIFER PALMER
JEFFREY CARLISLE
WILLIAM STAMPLEY, JR.
ALLEN CRANE
BARNEY HEGWOOD
MICHAEL S. FRENZEL

JULIAN TOUPS
STEPHANIE HAUPT
JENNIFER KANSAS
ALLYSON ARBOUR
DOUGLAS A. KUYLEN



## JENNIFER PALMER & COMPANY
### A Professional Rehabilitation Corporation

**NEW ORLEANS**
4500 Clearview Parkway
Suite 100
Metairie, Louisiana 70006
Phone: (504) 885-6500
Fax: (504) 885-6093
(800) 303-3593

**LAFAYETTE**
Versailles Centre, Suite 316
102 Versailles Boulevard
Lafayette, Louisiana 70501
Phone: (337) 269-1895
Fax: (337) 269-1955

**BATON ROUGE**
8281 Goodwood Boulevard
Suite H1
Baton Rouge, Louisiana 70806
Phone: (225) 927-6255
Fax: (225) 927-8817

**HOUMA**
8019 Park Avenue
Suite 200
Houma, Louisiana 70360
Phone: (504) 868-8280
Fax: (504) 868-8229

**SHREVEPORT**
P.O. Box 7196
Shreveport, Louisiana 71137
Phone: (318) 995-7089
Fax: (318) 995-7089

**MISSISSIPPI**
29 Amazing Grace Lane
Picayune, MS 39466
Phone: (800) 303-3593
Fax: (504) 885-6093

**OHIO**
P. O. Box 7147
Lafayette, Ohio 45854
Phone: (419) 649-9907
Fax: (419) 649-9905

Please respond to our Metairie office
e-mail: jcar1027@bellsouth.net

December 18, 2000

Mr. Edward Johnson
Johnson, Johnson, Barrios & Yacoubian
4900 One Shell Square Building
New Orleans, LA 70139

Re:   Wilton Harmon, Jr., vs.
      Pool Company
Your File #:   205-5911
Our File #:   27.000018

Dear Mr. Johnson:

For the purpose of a vocational assessment to determine Mr. Harmon's employability, rehabilitation potential, and wage-earning capacity, he was interviewed in our Lafayette, Louisiana, office on December 4, 2000.

In addition, the following documents were received and reviewed:

1. Accident report, dated 2/18/99;

2. Reports from State of Louisiana Employment Security, dated 7/28/95 through 11/22/95;

3. Reports from Dr. Joseph A. George, dated 2/15/96 through 8/16/96; Personnel records from Global Industries Offshore, L.L.C., dated 5/30/96 through 9/10/96;

4. Federal income tax returns for the years 1995 through 1998;

**EXHIBIT**

A

Mr. Edward Johnson
Re: Wilton Harmon, Jr.
Page 2

5. Social Security Earnings Records for the years 1994 through 1998;

6. Personnel records from Pool Company, dated 10/11/96 through 3/9/99;

7. Reports from American Legion Hospital, dated 2/21/96 and 4/7/99;

8. Reports from Dr. Robert D. Franklin, dated 4/1/99 through 6/24/99;

9. Reports from Acadiana Outpatient Surgery Center, Dr. Olga E. Reavill, dated 7/29/99 through 8/29/99;

10. Reports from Tri-City Physical Therapy, Inc., Francois Auray, PT, dated 11/5/99 through 1/6/00;

11. Reports from Physical Therapy Clinic of Rayne, Inc., Lendell Babineaux, PT, dated 4/9/99 through 3/29/99;

12. Personnel records from Russell Furniture Store, dated 4/27/00;

13. Personnel records from Rental City, Inc., dated 5/5/00;

14. Report from Dr. Stuart I. Phillips, dated 5/9/00;

15. Report from Lafayette General Medical Center, dated 6/27/00 through 6/30/00;

16. Personnel records from Nabors Drilling Company, dated 3/11/97 through 7/24/00;

17. Deposition of Wilton Harmon, Jr., dated 8/2/00;

18. Reports from Dr. John E. Cobb, of Lafayette Bone and Joint Clinic, dated 2/7/00 through 8/21/00;

19. Reports from Dr. Thomas J. Montgomery, dated 10/13/99 through 9/27/00; and

20. Vocational reports from Glenn M. Hebert, dated 5/16/00, 6/7/00, 10/4/00, and 11/29/00.

Mr. Edward Johnson
Re:   Wilton Harmon, Jr.
Page 3


## BACKGROUND INFORMATION:

Mr. Harmon was born on July 29, 1962, and is thus 38 years of age.  He continues to drive using a regular Louisiana operator's license which is valid until July 29, 2004.  This license has no restrictions.  Mr. Harmon attended the Martin Petitjean Elementary School in Rayne, Louisiana.  He completed the eleventh grade at Rayne High School in 1980.  He left school during the twelfth grade and had not repeated or skipped any grades.  In general, his grades were D's and F's with occasional C's.  He stated he left school because he did not like school and that he went to work within six to seven months after leaving school.  During his high school years, he took distributive education classes in farming, welding, and agriculture during the ninth and tenth grades.  He has not attempted to obtain a GED and states that he can read and spell with difficulty.  He does not handle a checking account, but he is able to make change.  He states he has no computer knowledge or experience, nor does he own a computer.

Mr. Harmon states that he is presently divorced and that he has had no previous marriages.  Mr. Harmon's ex-wife was Belinda Citizen Harmon and she was born February 29, 1964.  They were married for approximately fifteen years until obtaining a divorce in August 1999.  Prior to this time, they were separated and living apart.  They have two children, a girl 7 years (Jasmine K. Harmon, born April 16, 1993), and a boy 11 years (Wilton A. Harmon, born June 28, 1989) who both live with him.

At the time of Mr. Harmon's deposition on August 2, 2000, he stated he and his wife had "gotten back together," but they had not remarried.  He states they had been back together at that time for approximately six months.

Mr. Harmon is 6'1" tall and weighs 255 pounds.  Since his injury, he has had a weight gain of 30 to 50 pounds.  He is right hand dominant and states he has had no felony arrests or convictions.

Regarding financial status, Mr. Harmon receives Worker's Compensation in the form of maintenance and cure for a total of $580 a month.

Mr. Edward Johnson
Re:   Wilton Harmon, Jr.
Page 4

In terms of on-the-job training, Mr. Harmon received a one-day class in carpet laying while working for Russell's Furniture Store in 1987 or 1988.  Also, he is presently attending adult literacy classes in Opelousas, Louisiana.  Volunteer instructors teach and tutor adults in reading and writing coursework.  He started that program two to three months ago.  He states he also received a certification in carpet laying and he has no military experience.

Regarding hobbies and interests, he played basketball and baseball in the neighborhood and enjoyed hunting.  He states that he laid carpet during his spare time for extra income.  He states that since his injury, he cannot participate in the above activities.

Mr. Harmon states although he does not pursue any of the above activities, he performs periodic back exercises at home and can usually bathe and dress himself.  He states he occasionally needs help with putting on socks, underwear, pants, and shoes.  He also requires periodic help with tying his shoes, and states he cannot pick up his children as he did before.  He states he usually stays at home and watches television and does some walking around the house and in a two block area for exercise.  He sees Dr. John E. Cobb every three months for follow-up and sometimes visits his friend who works at a mechanic shop nearby.

**WORK HISTORY:**

After leaving school in the twelfth grade in 1980, Mr. Harmon was unemployed for six to seven months until his first job at Russell's Furniture Store in Rayne, Louisiana.  He worked there from 1981 to 1992.  He began employment as a **furniture deliverer** in residential areas.  His job included loading furniture on a truck using a hand truck.  He worked full-time earning $6.00 to $7.00 an hour at the time he left the company.  While with Russell's Furniture, Mr. Harmon learned to lay carpet and he periodically performed carpet laying in his spare time.  He left this company to earn more money.

Mr. Edward Johnson
Re:   Wilton Harmon, Jr.
Page 5

In 1991 or 1992, Mr. Harmon became employed by Rental City in Rayne, Louisiana. His job was to **deliver furniture** in residential areas. Again, this including loading a truck and he earned approximately $7.00 an hour until 1993 when he left, according to him, over a dispute regarding not receiving an increase in pay.

For a short time after that, he opened his own store known at H & H Rent-to-Own in Rayne, Louisiana. He remained in that business in which he was a **partner** with his cousin. Mr. Harmon handled **sales** and **delivery**, and his cousin handled the books. He was occupied in the business from approximately 1994 to 1996. He states the business closed when his cousin decided he did not want to participate further.

In his deposition, Mr. Harmon mentioned he worked for Global Industries. According to personnel records, he worked there from May of 1996 through September 1996 as a **marine deckhand**. There were also indications that he worked for the company as a **roustabout** on a jack-up rig.

His personnel record additionally indicates he worked for Nabors Drilling Company for a short period of time until terminated on July 9, 1997. Income tax records indicate Mr. Harmon worked for a very short time in 1997 for Phase Seven, Inc. with total earnings of $235.50.

Mr. Harmon began employment at the Pool Company as a **roustabout** in 1996. He was earning between $9.75 an hour and $9.99 an hour at the time of his injury on February 18, 1999. He was working on an offshore jack-up rig performing the usual roustabout duties such as chipping, painting, cleaning, and moving pipe. He also offloaded supplies and worked up in the derrick catching pipe with work tongs. He worked 12-days-on/12-days-off with 12-hour work shifts.

### PRIOR MEDICAL HISTORY:

Mr. Harmon states in approximately 1979, while playing basketball in high school, he hurt his knee. He did not go to a doctor and this did not result in surgery. He states the right knee swelled, but does not currently bother him.

Mr. Edward Johnson
Re:  Wilton Harmon, Jr.
Page 6

On February 15, 1996, Mr. Harmon saw Dr. Joseph A. George with complaints of pain in the head, left knee, and backache. He stated on February 8, 1996 he was involved in an automobile accident, being hit on the passenger side. He was the driver and not wearing a seat belt. The doctor's impression was cervical spine strain; lumbosacral spine strain; and contusion of the left knee which probably aggravated a pre-existing condition. (This may represent another injury because in deposition, Mr. Harmon reported it was the right knee he hurt playing basketball. The other possibility is there is some confusion on Mr. Harmon's part as to which knee was hurt).

X-rays taken on February 22, 1996 showed a normal cervical spine, normal lumbar spine, and normal left knee. Mr. Harmon returned on March 8, 1996 with complaints in his neck and left knee. The cervical spine showed no spasm, although there was pain over C-6 and C-7 vertebra. The lumbosacral spine showed no difficulty getting out of the chair and a normal gait with no spasm.

Mr. Harmon came back on April 9, 1996 with his back still bothering him, but not his leg. There was no spasm in the cervical spine and the left knee showed crepitation on flexion and extension. Mr. Harmon was seen on approximately two week intervals during this period of time, and on August 16, 1996, the last recorded visit with Dr. George, the MRI had not been received.

## MEDICAL SUMMARY:

On April 1, 1999, Mr. Harmon saw Dr. Robert D. Franklin stating he had been involved in a lifting-type injury on February 18, 1999 injuring his neck, upper back, mid-back, and low back. Dr. Franklin's examination indicated Mr. Harmon had myofascial pain syndrome which affected the paracervical, trapezius, interscapular, and lumbar paraspinals. He had radiculopathy into the right lower extremity. Dr. Franklin felt the pains were of soft tissue origin and decided on conservative treatment such as home exercises and the medications *Lodine, Robaxin*, and *Bupap*. The doctor felt Mr. Harmon was temporarily disabled from employment.

Mr. Edward Johnson
Re:   Wilton Harmon, Jr.
Page 7

On April 7, 1999, a radiology report from the American legion Hospital indicated lumbosacral spine series were performed that showed <u>no</u> evidence of fracture, spondylolysis, or spondylysthesis.  The facet joints all appeared to be normal.

Mr. Harmon was seen on April 9, 1999 at the Physical Therapy Clinic of Rayne, Inc. by physical therapist, Lendell Babineaux.  He reported lumbar spine pain and difficulty bending or sitting and staying in one position for very long.  He was placed on a home exercise program and seen twice a week.  They felt he was unable to return to work as a laborer in the oil field <u>at that point</u>.

On April 29, 1999, Mr. Harmon returned to Dr. Franklin with the same symptoms.  He recommended more lumbar work-up and possibly a lumbar MRI scan and a Medrol dosepak.  He was to continue *Lodine* and given a prescription for *Ambien* and *Ultram*. Mr. Harmon had an MRI scan on May 27, 1999 that revealed disc bulges at L4-L5 and L5-S1, as well as facet hypertrophy.   Facet arthropathy was noted on June 24, 1999 and the doctor suggested facet blocks.

On July 29, 1999, Mr. Harmon was seen at Acadiana Out-Patient Surgery Center by Dr. Olga E. Reavill.  He received a diagnosis of sacroileitis and received a bilateral sacroiliac joint injection.  He received the same types of injections on August 13, 1999.

Dr. Thomas J. Montgomery examined Mr. Harmon on October 13, 1999 and determined he could return to <u>light-duty</u> work stating it was counterproductive to keep him out of work.  Dr. Montgomery did not think the injections from Dr. Reavill or the physical therapy were working.  The doctor was hopeful Mr. Harmon's symptomatology would resolve in the next two to three months and he would be able to return to his regular duty job.  The doctor recommended a functional capacity evaluation and no surgery.

Another sacroiliac injection was provided by Dr. Olga E. Reavill on October 29, 1999.

Mr. Edward Johnson
Re:  Wilton Harmon, Jr.
Page 8


For the period November 5, 1999 through November 9, 1999, Mr. Harmon was seen at
Tri-City Physical Therapy, Inc. by Francois Auray, physical therapist. He received range
of motion and manual therapy to restore joint movement and decrease pain.  These visits
continued until the last visit of January 6, 2000 when a recommendation was made for him
to continue for another two to three weeks.

On February 7, 2000, Mr. Harmon was seen by Dr. John E. Cobb of the Lafayette Bone
& Joint Clinic. Dr. Cobb noted Mr. Harmon had lumbar pain syndrome, a probable
herniated disc, and a column failure. Dr. Cobb recommended an anterior lumbar
interbody fusion at L4-L5 and possibly at L5-S1.

On March 14, 2000, Lendell Babineaux, physical therapist, felt Mr. Harmon had
decreased range of motion, was unable to return to work in the oilfield as a laborer at that
time and needed positive intervention. Mr. Harmon ceased physical therapy on March 29,
2000 due to transportation problems. He felt better when he was "in motion" and he
continued exercising along with ambulation at home.

On May 9, 2000, Mr. Harmon was seen by Dr. Stuart I. Phillips in New Orleans. Dr.
Phillips noted a 25% to 30% loss of lumbar motion in flexion, extension, and lateral
bending, with moderate muscle spasm on rest and stress. Dr. Phillips' opinion was that
Mr. Harmon likely had lumbar disc disease and a herniated nucleus pulposes. He also felt
the annulus was torn and stretched which allowed mobility and narrowing of the joint
which probably caused his pain. The doctor said Mr. Harmon could limit his activities,
accept the discomfort, wear a corset, and take pain medications or decide on an anterior
lumbar fusion which he considered to be a "large operation."

Also on May 9, 2000, Mr. Harmon returned to Dr. Thomas J. Montgomery for follow-up
and second opinion after seeing Dr. Cobb who recommended a fusion at L4-L5. Mr.
Harmon noted movement makes his pain better and when he lies down, the pain doesn't
change. Dr. Montgomery's impression was degenerative disc disease and under
recommendations, the doctor noted "I certainly would not recommend surgery on this
gentleman at this point." He felt he needed EMG/nerve conduction studies along with
flexion and extension films of his lower back, as well as a trial with a back brace.

On June 23, 2000, Dr. John E. Cobb fit Mr. Harmon for a lumbar corset and he was told to bring it to the hospital on the day of the surgery.  On June 27, 2000, an anterior discectomy and anterior arthrodesis using Danek dowels at L3-L4 and L4-L5 was performed by Dr. Cobb and Dr. Daniel J. Carroll.  Mr. Harmon was discharged on June 30, 2000 and his post-operative course was routine.  At the time of discharge, he was ambulating without difficulty and was maintained on oral analgesics.

Mr. Harmon was fit for an external bone growth stimulator and was told to use it as close to twenty-four hours per day as possible.

As of July 10, 2000, Mr. Harmon returned and was encouraged to increase his physical activities and begin a walking program.  He returned on August 21, 2000 and x-rays showed good healing of the bone grafts.  Again, the doctor recommended increased physical activities to tolerance and prescribed *Lortab-5* for discomfort.

On September 27, 2000, the operative reports were reviewed by Dr. Thomas J. Montgomery who stated Mr. Harmon received the surgery against his advice.  Dr. Montgomery felt the operative report "really don't change my view regarding the recent surgery.  If he had not performed surgery, you would hope that someone who sustained an injury to their back would recover at six months; however maximum medical recovery after a fusion would probably take twelve to eighteen months."

According to Mr. Harmon, he sees Dr. Cobb approximately every three months.  He continues with home exercises and states on a daily basis, he has low back pain at his belt line to his buttocks.  There is radiation of pain with occasional numbness down the back of his right leg to the ankle area.

He states occasionally he has to stay in bed, and some mornings he cannot get up until 11:00AM, and some days he is back in bed by 2:00PM until 6:00 or 7:00PM that night.  He states after sitting for 30 to 45 minutes, he needs to move around.  He understands he is to have periodic evaluations by Dr. Cobb along with the medication *Lortab*, one every four hours for pain which gives him no side effects.  He states he uses a cane periodically and a brace used occasionally while in his home and while walking.

Mr. Edward Johnson
Re:  Wilton Harmon, Jr.
Page 10

### VOCATIONAL TEST RESULTS:

On December 4, 2000, Mr. Harmon was administered the *Woodcock-Johnson (Revised) Tests of Achievement* and the *Slosson Test of Intelligence – Revised*.

### Woodcock-Johnson (Revised) Tests of Achievement

The *Woodcock-Johnson (Revised) Tests of Achievement* subtests of Letter/Word Identification, Passage Comprehension, Calculation, and Applied Problems were administered.

On the Letter/Word Identification subtest, Mr. Harmon scored at the 1.6 grade equivalent, indicating his ability to recognize and pronounce words such as *when, must,* and *whole*.

On the Passage Comprehension subtest, which assesses skills in completing a sentence or short passage and identifying or stating a word that would be appropriate in the context of that sentence or passage, he scored at the 1.7 grade equivalency.

His results on the Calculation subtest place him at the 7.0 grade equivalent, demonstrating his ability to correctly perform paper-and-pencil computation of mathematical problems presented in the traditional problem format. He was able to correctly calculate problems involving single and double-digit addition, subtraction, multiplication, and long division. He also successfully completed problems involving the proper placement of decimals and the addition of compound fractions, but he did not attempt any algebraic equations or higher level math.

On the Applied Problems subtest, which measures an individual's skills in analyzing and solving practical word problems in mathematics, Mr. Harmon scored at the 7.4 grade equivalency, demonstrating a slightly greater grasp for mathematical problems presented in word format than he did in the traditional paper-and-pencil format. In the word format, he was able to correctly solve problems involving time, money, and distance.

Mr. Edward Johnson
Re:  Wilton Harmon, Jr.
Page 11

### Slosson Intelligence Test - Revised

The *Slosson Intelligence Test – Revised* was administered to Mr. Harmon in order to assess his level of intellectual functioning and potential for learning, as compared to other individuals in his age range. His total standard score of 62 places him in the "mild mentally handicapped" range. This is only an estimate of Mr. Harmon's true level of intellectual functioning; however, we can be reasonably confident (95%) that his true standard score would fall within 9 points of his estimated score, which would bring him into the "borderline mentally handicapped" range. This would indicate that he could function in slow learner classes.

It is interesting to note that Mr. Harmon performed substantially better in the areas of calculation and especially in the area of applied problems, although the applied problems section of the test requires comprehension ability in order to determine the problem and what is being asked to perform, to arrive at a solution.

It is also interesting to note that for approximately two to three months, Mr. Harmon is now enrolled in an adult literacy class in Opelousas, Louisiana in which he is taking reading and writing coursework. Also in deposition (page 19:19-25), Mr. Harmon states he handled the paper work and money while delivering furniture for Russell's Furniture Store. Also, in his own business, H & H Rent-to-Own, Mr. Harmon handled "sales" which probably included contracts.

### VOCATIONAL ANALYSIS:

Mr. Harmon's past employment consisted of furniture mover/driver, (905.663-018; very heavy/semi-skilled); carpet layer, (864.381-010; heavy/skilled); furniture rental consultant, (295.357-018; light/semi-skilled); roustabout, (939.687-018; very heavy/unskilled); and floor worker/well service, (930.684-014; heavy/semi-skilled).

Mr. Harmon's past work activities required that he function among data, people and things as follows:

Mr. Edward Johnson
Re:   Wilton Harmon, Jr.
Page 12

Among *data*, he gathered and classified information about people, things, and products, and issued reports or receipts that described the actions taken.  It was also necessary that he be able to easily determine the function, structure, and materials used in the construction of various items.

Among *people*, Mr. Harmon functioned by being able to persuade or influence various customers and other persons in favor of a certain product or service.  He worked with other individuals in a cooperative team manner by conveying information verbally and by other directions.  It was also necessary that he take instructions and directions from other persons with whom he worked and other supervisory persons.

Mr. Harmon worked among *things* by using his body and special tools to place materials in a position to be worked with and upon.  His past work activity depended largely on this ability to have the right material in the right place at the right time.

In his work, he operated various machines and work aids.  In some of his work activities, timing was a crucial element in the work being performed as a team member.  In other aspects of his work, it was necessary that he drive vehicles and convey sometimes large pieces by hand truck.  Much of these work activities allowed for very little judgment in attaining certain outcomes.

Mr. Harmon demonstrated in his past work an interest or preference for activities that dealt with things and objects and activities of a routine, but organized nature.  He also preferred activities that related to machines and techniques.

He demonstrated that he had the temperaments or personal traits that allow for adaptability to influence persons' opinions about ideas and things and "sell" them on certain objects and services.  He was able to deal with these persons beyond the mere giving and receiving of instructions and was able to make decisions based on his judgment and other verifiable criteria.  He was able to perform repetitive work continuously at a required pace and meet deadlines.

Mr. Edward Johnson
Re:   Wilton Harmon, Jr.
Page 13

Mr. Harmon's past jobs required that he have average aptitudes or "ability to learn" in the areas of general intelligence including verbal and spatial comprehension.  He was also average in form perception, motor coordination, finger dexterity, manual dexterity, eye/hand/foot coordination, and color discrimination.

Mr. Harmon acquired various work skills in his past work activity that are considered transferable at this time, such as his ability to:  operate various vehicles by coordinating his eyes/hands/feet.  These machines or vehicles were operated on the roads and also in warehouses.  His past work required that he be able to understand directions and written specifications.  He needed to provide measurements of various commodities and door spaces.  It was also necessary that he use arithmetic to measure and estimate material quantities and to make change and collect bills.

## DISCUSSION:

At the recommendation of Dr. Stuart I. Phillips and Dr. John E. Cobb, on June 27, 2000 Mr. Harmon received an anterior discectomy and anterior arthrodesis using Danek dowels at L3-4 and L4-5 performed by Dr. Cobb and Dr. Daniel J. Carroll.  At the time of his discharge on June 30, 2000, Mr. Harmon was ambulating without difficulty, and he was fit with a bone growth stimulator.  Mr. Harmon has been seen at approximately three month intervals and as of August 21, 2000, Dr. Cobb reported "good healing of the bone grafts."  Dr. Cobb recommended increased physical activities to tolerance and prescribed Lortab for discomfort.

Although during interview, Mr. Harmon continued to present various physical complaints and symptoms such as needing to move around every 30 to 45 minutes, it can be noted by literature on the subject that persons with a fusion in the lumbar spine area are able to return to sedentary work in a minimum of six weeks after surgery and to very heavy work in a maximum of 52 weeks after surgery.  This information is reflected in the chart that follows:

Mr. Edward Johnson
Re:   Wilton Harmon, Jr.
Page 14

| EXPECTED LENGTH of LUMBAR DISABILITY[1] | | |
|---|---|---|
| JOB CLASSIFICATION | MINIMUM | MAXIMUM |
| Sedentary Work | 6 weeks | 12 weeks |
| Light Work | 8 weeks | 12 weeks |
| Medium Work | 10 weeks | 16 weeks |
| Heavy Work | 12 weeks | 52 weeks |
| Very Heavy work | 12 weeks | 52 weeks |

Since this chart indicates that return to even very heavy work is possible within one year after surgery, this indicates that Mr. Harmon could possibly return to his previous employment at the end of his recuperation from this surgery. Before this can be determined, restrictions will need to be clarified with Dr. Cobb.

In the event that Mr. Harmon does not choose to return to that level of work, or if for some reason that level of work proves to be contraindicated by some development in the future, the chart that follows suggests alternative employments that relate to the type of work that Mr. Harmon performed in the past and for which he remains qualified according to his vocational profile. The chart that follows analyzes the physical strength demands for each of these jobs along with the median hourly wages paid for these jobs in Mr. Harmon's home area. It can be noted that the jobs suggested range from sedentary to medium and all but one of these jobs would essentially replace Mr. Harmon's former earnings. A period of on-the-job training may be necessary for Mr. Harmon to undergo prior to performing the work duties of certain positions.

---

[1] *The Medical Disability Advisor, Workplace Guidelines for Disability Duration, Second Edition,* by Presley Reed, M.D., L.R.P. Publications, Horsham, PA. 1994, p. 609.

Mr. Edward Johnson
Re:   Wilton Harmon, Jr.
Page 15

| ALTERNATIVE EMPLOYMENT PROJECTIONS by PHYSICAL STRENGTH DEMANDS and MEDIAN HOURLY WAGES | | |
|---|---|---|
| JOB TITLE | PHYSICAL STRENGTH DEMANDS | MEDIAN HOURLY WAGES[2] |
| Protective Signal Monitor | Sedentary | $ 11.28 |
| Dispatcher, Oilwell Services | Sedentary | $ 11.17 |
| Forklift Operator | Medium | $ 9.89 |
| Assembler, Small Products | Light | $ 8.37 |
| General Machine Operator | Light-Medium | $8.18 |

The jobs listed in the chart above are not meant to be all-inclusive, but are merely an example of the types of jobs that are available to Mr. Harman that I am of the opinion that he could perform satisfactorily, based on his vocational profile.

**SUMMARY:**

Since Mr. Harmon received surgery on June 27, 2000, he will not be one-year post-operative until June 27, 2001.  Barring any future complication, according to the literature, he might be able to approach heavy to very heavy work activities, depending upon extent of recovery, with essentially no wage loss.  Physician input regarding restrictions is necessary before this option can be fully investigated.  Alternative jobs, based on Mr. Harmon's vocational profile, have been identified with physical strength demands that range from sedentary to medium hourly wages of $8.18 an hour to $11.28 an hour.

---

2      U.S. Census, Bureau of Labor Statistics, *Occupational Wage Survey*, 1999, Lafayette, Louisiana area.

Mr. Edward Johnson
Re:   Wilton Harmon, Jr.
Page 16

I would appreciate the opportunity to review any additional information, as it becomes available through the discovery process, and is applicable to the considerations made in this report.  I reserve the right to provide an addendum to this report based on such a review.

Thank you for the opportunity to be of assistance to you in this matter.  Please contact me with any questions that you may have.

Sincerely,

JEFFREY E. CARLISLE
Licensed Rehabilitation Counselor #238

JEC:sdc

**LAWRENCE N. CURTIS**

201 Rue Iberville, Suite 300
Post Office Box 80247
Lafayette, Louisiana 70598-0247
(337) 235-1825 Telephone
(337) 237-0241 Telefax
larryc@curtislambert.com

RECEIVED

JAN 1 6 2001

ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT, LOUISIANA

January 16, 2001

# Curtis & Lambert
PERSONAL INJURY ATTORNEYS

Hon. Catherine B. Carter, Deputy Clerk
United States District Court
800 Lafayette Street, Suite 2100
Lafayette, Louisiana 70501

**BY HAND DELIVERY**

        Re:  Wilton Harmon, Jr.
        Vs:  Pool Energy Service Co.
             USDC - W.D. C.A. No: 00-0490
             Our File No: 2381-LNC

Dear Ms. Carter:

        Enclosed for filing in the above-entitled and numbered cause
is Plaintiff's Motion to Exclude Expert Testimony Under Daubert and
its Progeny, with Memorandum in support thereof.

        Judge Doherty and opposing counsel are being provided a copy
of these papers as indicated below.

        Thank you in advance for your cooperation in this matter.

                Yours very truly,

                CURTIS & LAMBERT

                Lawrence N. Curtis

LNC/nlc
Enclosure

cc:  Hon. Rebecca F. Doherty, Judge (by hand delivery)
     Edward S. Johnson, Esq. (by fax and ordinary mail)

A Professional Law Corporation